PER CURIAM.
This case is before the Court on appeal from two judgments of conviction of first-degree murder and two sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Richard Robards was convicted in Pinellas County of the 2006 murders of Clearwater residents Lin *1259 da and Frank Deluca and he now pursues the direct appeal of his convictions and sentences which are subject to automatic review by this Court. For the reasons explained below, we affirm the trial court’s judgments of conviction and sentences of death. We first set forth the facts of this case and we then address Robards’ claims on direct appeal. We conclude by evaluating the sufficiency of the evidence used to convict Robards and the proportionality of the death sentences that Robards received for murdering the Delucas.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
Around mid-morning on August 2, 2006, the Delucas’ friend, John Baird, arrived at their home to visit Frank Deluca as the two planned just days earlier. Although both of the Delucas’ cars were at the home, no one answered the door, so Baird let himself in, thinking that Frank Deluca simply did not hear him knock on the door. Once inside, Baird noticed that the inside of the home was blackened and scorched and he saw a gas can in the foyer. Although he did not see an active fire, he noticed about two inches of ash on the floor and saw a melted smoke alarm. Baird called out to see if anyone would respond and did not receive an answer. He walked toward the back of the home to the office and noticed a comforter on the floor and Frank Deluca lying next to it. Baird lifted the comforter and saw Linda Deluca lying underneath it. After trying unsuccessfully to get a response from either of the Delucas, Baird went to a nearby school and contacted the school resource officer, who then contacted emergency dispatch.
Around noon that day, various city and county emergency units responded to the Delucas’ home. Extensive fire damage was observed inside the home, and it was determined that a fire occurred there but that it snuffed itself out due to a lack of oxygen. Because heat was radiating from the home and the air quality inside the home was compromised, paramedics and law enforcement officers coordinated a plan of action for processing the scene. Two deceased victims, one male and one female, were found inside the home. The bodies of both victims bore evidence of heat exposure as well as trauma to the neck and the chest, and both victims were declared' dead as the result of unsurvivable trauma. Both deaths were ruled homicides and the associate medical examiner confirmed that both victims suffered multiple sharp force injuries. No signs of forced entry were found at the home.
An arson investigation revealed that the fire was the result of arson and was set by a person who used a flammable fluid as an accelerant. The arson investigator determined that the fire started in the hallway that led to the office where the bodies were found, and he observed a trail of clothes and towels down the length of the hallway. Additionally, burnt newspapers and towels were found near the area where the bodies were found. The investigator concluded that the victims were inside the home when the fire was set; an accelerant detection dog alerted to sources of flammable fluid at the beginning and the end of the clothing/towel trail in the hallway and on the bodies of both victims.
Outside the home, two vehicles registered to Linda Deluca were found in the driveway sheltered underneath a carport. Gouge or scrape marks that ran down the length of the driveway between the two vehicles led investigators to believe that an item had been removed from the home and then moved down the driveway, and they soon learned that a safe was missing from the Delucas’ home.
*1260 Investigators concluded that the murders and the fire occurred on or between July 31 and August 1. The timeline was based in part on information provided by an eyewitness who saw smoke coming from the Delucas’ chimney late in the afternoon on August 1. Moreover, the Delu-cas’ August 2 issue of the St. Petersburg Times was never retrieved from the front of their home and was found at the foot of the driveway near where the gouge marks ended.
The investigation and the search for possible suspects quickly focused on Richard Robards, who was once the Delucas’ personal trainer. Robards became a suspect in the murders after investigators learned that he knew the Delucas and that his fingerprints were identified on a crumpled piece of newspaper that was found in the Delucas’ southeast bedroom. The piece of newspaper, which was not destroyed in the fire, was from the July 31 issue of the St. Petersburg Times and contained three of Robards’ latent fingerprints. Further investigation of Robards’ activities before, around the time of, and after the murders yielded additional evidence that linked Ro-bards to a role in the Delucas’ deaths, the theft of items from the Delucas’ home, and the arson at their home.
In the weeks leading up to the murders, Robards told a number of witnesses that he owned or had access to a safe with a substantial amount of money in it. Several weeks before the murders, Robards asked his friend Shane Harper to help him steal a safe from the Delucas’ home by serving as the getaway driver, but Harper refused.
During the month before the murders, July 2006, Robards was an inmate in the Pinellas County Jail. While he was in jail, he met another inmate named Robert Ken-ney. Kenney overheard Robards telling a criminal defense attorney that he had funds in a safe that could be used to pay for the attorney’s services. Robards later told the attorney that he could not get into the safe because he lost the combination. Also while in jail, Robards called a bail bondsman and told him that he had a $40,000 bond and money in a safe that he could access within twenty-four hours of release. Robards would not tell the bondsman where the safe was located.
After Robards was released from jail, he maintained contact with Kenney, who was at that time living with his girlfriend Jessica Ridpath in her home. Robards told Ridpath that he had $50,000 in a safe and that he was planning to place a down payment on a townhome near where she and Kenney lived.
Around 10 a.m. on August 1, Robards came to Ridpath’s home to see Kenney. Robards was acting nervously. He washed his shoes in the kitchen sink and Kenney saw him carrying Ridpath’s gasoline can. Robards asked Kenney if he could borrow a pair of Kenney’s shoes as well as Kenney’s Ford Explorer so that he could move some personal belongings. Kenney agreed to these requests. Ro-bards also asked Kenney to keep a duffel bag that contained marijuana but Kenney refused to do so. After Kenney gave Ro-bards the keys to the Explorer, Robards left alone.
At 11:23 a.m., Robards rented a utility dolly from a U-Haul store and provided his driver’s license and credit card to secure the rental. Robards returned to Rid-path’s home a couple of hours after borrowing the Explorer and asked Kenney to help him move a safe. Kenney went with Robards and noticed a red dolly in the back seat of the Explorer. Robards drove to the Delucas’ neighborhood and first drove around it before going to their home. When they arrived, Kenney noticed that someone had already tried to *1261 move the safe down the driveway. When he realized that vehicles were parked in the driveway, he asked Robards why the people at the home could not help him move the safe. Robards replied that he was involved in an argument with them and he just wanted to get his belongings and leave.
Robards and Kenney tried to put the safe into the Explorer, but the safe was too large. Robards pushed the safe back underneath the carport between the vehicles, and the two men left in search of equipment that was durable enough to move the safe. At 2:28 p.m., Robards rented a trailer from Nations Rent. After an adapter was added to the Explorer, the Explorer was equipped to haul the trailer and the safe.
Again, Robards drove around the Delu-cas’ neighborhood instead of directly to their home. When Robards and Kenney arrived at the home, they placed the safe onto the trailer and drove off. Kenney was unaware at the time that Robards intended to store the safe in Ridpath’s garage. After driving for a short time, Robards stopped and put a tarp on top of the safe. Robards then convinced Kenney to let him hide the safe in Ridpath’s garage.
Ridpath arrived home that evening after getting off of work at 5:15 p.m. and noticed that Robards’ car was there, but Kenney’s Explorer was not. Robards and Kenney arrived about thirty minutes later and without Ridpath’s knowledge, they placed the safe in the garage. Robards wiped the safe clean and made sure that it was not in plain view in the garage. Before leaving, Robards asked Ridpath for some air freshener because his car smelled “musty.” He used it briefly and then left.
The evidence that implicated Robards also revealed that at the time of the murders, Robards was renting two storage units at a storage facility in Largo, Florida. Surveillance conducted there identified a vehicle linked to Robards coming and going from the storage facility in the days just after the murders. Although he had not accessed the units since May 24, 2006, in the days following the murders, Robards accessed his storage units on August 2, 4, and 5, 2006. After learning that a safe was taken from the Delucas’ home, law enforcement obtained a search warrant for Robards’ storage units. The Delu-cas’ safe was not found there, but a rifle that belonged to Frank Deluca was retrieved from one of the units.
Robards was also linked to the murders through his possession of a scale that was taken from the Delucas’ home. During the week following the murders, Robards went to the home of his friend Shane Harper with a scale and a cooler of marijuana and asked Harper to sell thé marijuana for him. Harper took the marijuana and the scale but later decided to call law enforcement instead of selling the marijuana as Robards requested. Harper gave the items to the Clearwater police, but he agreed to call and tell Robards that he sold the marijuana and had the money from the sale. The police gave Harper $900. When Robards arrived at Harper’s home, Harper was wearing a wire so that the police could conduct surveillance of the meeting. Robards took the money and left, and the police subsequently arrested him for possession of marijuana. The serial number on the scale that Robards gave Harper matched the serial number on a box found at the Delucas’ home.
Further incriminating evidence was found one week after the murders when a detective responded to a contact from the City of Clearwater recycling department. Earlier that day while watching a cardboard-only recycling truck dump out its load from the day’s route, an employee *1262 saw a purse fall out of the truck. The employee retrieved the purse from the load and determined that it belonged to Linda Deluca, whose name the department employees recognized from recent news coverage. Linda Deluca’s wallet and Social Security and credit cards were found inside the purse. During a more detailed search of the entire truckload, the detective also found a white Dimmit Automotive t-shirt. The detective gathered the t-shirt as evidence because Robards had worked at Dimmit Automotive in May and June 2006, and he had been provided several identical t-shirts to wear as his work uniform.
Additional evidence was seized from motels where Robards stayed around the time of the murders. Robards stayed at the Clearwater Inn from July 22 to August 3, 2006. When the housekeeper went into Robards’. room after he checked out of it, only one towel remained of the ones that were placed in his room. Blood stains were found on the room’s doorknob and were consistent with Robards’ DNA profile. Additionally, the trailer that Robards rented from Nations Rent was retrieved from the Clearwater Inn property. A later search of the Motel 6 where Robards stayed after leaving the Clearwater Inn yielded another Dimmit Automotive t-shirt.
After Robards was arrested, Robert Kenney called a locksmith about getting someone to open the safe that remained in Ridpath’s garage. The locksmith told Kenney that he would call back with more information, but Kenney was not contacted again about the safe until detectives came to Ridpath’s home about two weeks later. Kenney told the detectives that he had some of Robards’ belongings and he showed them the safe, which the detectives seized as evidence. Later a locksmith opened the safe at the Pinellas County Sheriffs Office; it contained $88,700 in cash as well as documents and wedding rings. The position of the wheels on the safe was consistent with the dimensions of the marks left in the Delucas’ driveway.
Photographs taken of Robards at the Clearwater Police Department after his arrest revealed multiple scrapes and scratches on his hands. When Frank De-luca’s fingernails were examined for DNA, two separate sources were identified. The profiles were consistent with Linda Deluca and Richard Robards.
While in jail on the possession charge, Robards contacted crime scene detective Anthony Monte, who worked very closely with lead detective Christopher Precious in conducting the Deluca homicide investigation. Robards tried to contact Detective Monte several- times, and two weeks after the murders, he left a message for the detective about “mak[ing] a deal.” Ro-bards told Detective Monte that he was involved in the Delucas’ murders but that the deaths were connected to a drug ring in Orlando. A detective was subsequently assigned to investigate Robards’ claim. Although a trace amount of marijuana was found inside the Delucas’ home, no evidence was found to substantiate the allegation.
Weeks after the murders, Kenney found a handgun wrapped in a towel inside of a suitcase that he kept stored in Ridpath’s garage. The gun was not confirmed as having belonged to Linda Deluca but was linked to her through an identification by her son, Christopher. Linda Deluca was a surveyor who had a concealed weapon permit and carried a handgun for safety, yet no handgun was found in her purse, in the recycling load that contained her purse, or in the Delucas’ home.
Robards was indicted on August 22, 2006, for two counts of first-degree murder. In September 2007, the trial court *1263 found that Robards was incompetent to proceed and that he met the criteria for involuntary placement in a mental health treatment facility. Robards was placed in the forensic unit of the State mental hospital where he remained for several months. During that time, with the help of two hospital employees, Robards and another patient attempted to escape. On the night of the attempt, hoping to elude the hospital staff, Robards and the patient used clothing and sheets to make dummies for their beds. Then, using tools provided by the two employees, they sawed through security screens to pry open a window. They climbed up the plumbing of their housing pod to the roof and moved to the roof of another pod where they were caught. A few months later, in May 2008, the trial court found that Robards was competent to proceed.
Robards’ trial began on May 18, 2010. At trial, the associate medical examiner who both reported to the crime scene and performed the autopsies on the Delucas testified to the following findings. Linda Deluca, who was five feet three inches tall and weighed 140 pounds, sustained multiple sharp force injuries consistent with a knife or other instrument with a sharp edge. Her most severe wound severed her neck and was described as follows: “And it injured the thyroid cartilage which is the — commonly known as the Adam’s apple that you can easily feel on the front of your neck. It went through the major blood vessels. Mainly the internal jugular vein as well as the external corotid [sic] arteries. It also exposed the back of the spine of the neck which was, in medical terms, the vertebral column. So basically, it was a severely incapacitating injury.” Linda Deluca also suffered additional stab wounds to the neck and back. She had no defensive wounds. The medical examiner testified that she likely lost consciousness within two to three minutes of the severing of her jugular and carotid arteries.
Frank Deluca, who was five feet nine inches tall and weighed 213 pounds, also suffered multiple stab wounds, including one on the right front of the neck that injured his carotid artery and jugular vein. He sustained additional wounds to his chest, hands, and lower extremities, including defensive wounds to his left hand. Like Linda Deluca’s, Frank’s injuries were consistent with a knife-like weapon.
The medical examiner was unable to determine either of the Delucas’ exact time of death or which spouse died first, but he concluded that the multiple sharp force injuries sustained by both victims caused rapid bleeding and subsequently, their deaths.
On May 21, 2010, the jury returned verdicts finding Robards guilty of the first-degree murders of Linda and Frank Delu-ca. The trial proceeded to the penalty phase the following week. Robards’ penalty phase was held on May 25, 2010. The State presented one penalty phase witness, Linda Deluca’s sister. The defense presented several witnesses, most of whom were Robards’ family members, friends, fellow inmates, or former clients. Most of the defense’s presentation consisted of character evidence about aspects of Ro-bards’ personal life and professional life. Additionally, Shane Harper testified that Robards initially planned to rob the Delu-cas’ home while they were on vacation and did not intend that anyone would be at home when the robbery took place.
For each of the murders, the jury was instructed to consider four aggravating circumstances: (1) prior conviction of another capital felony (based on the contemporaneous murder of the second victim); (2) murder committed during the commission of a robbery; (3) murder committed for pecuniary gain; and (4) the murder was especial *1264 ly heinous, atrocious, or cruel (HAC). No statutory mitigation was presented during the penalty phase, but the jury was instructed to consider the following nonstat-utory mitigating circumstances: (1) Ro-bards’ family background, employment, and good Pinellas County jail record; and (2) any circumstances of the offense that would mitigate against the imposition of the death penalty. For each murder, by a seven-to-fíve vote, the jury recommended that Robards receive the death penalty.
Prior to sentencing, the trial court conducted a three-part Spencer[1] hearing on three dates in July, August, and October 2010. The State presented two witnesses, both of whom testified about the blood splatter found in the Delucas’ home and provided additional context to the injuries that the victims suffered. There were significant stains of aspirated blood about four feet high on the hallway bathroom door. Another pattern of blood spatter on the door leading into the room where the bodies were found indicated that not all of the injuries were sustained in a single room in the Delucas’ home. Another source of blood found in the hallway a few feet away from the bathroom revealed that one of the victims was on the floor at one point and bled significantly; however, at some point, the victim moved or was moved to another area and someone stepped in the pool of blood and created significant blood splatter. Because of the severe fire damage to the Delucas’ home, the blood evidence that was available for testing was very limited. However, a blood-stained blanket and two swabs of what was believed to be blood were submitted for testing. The results from the blanket and one of the swabs were consistent with the DNA profile of Linda Deluca.
Although mental health mitigation was not presented to the jury during the penalty phase, the defense presented three mental health expert witnesses during the Spencer hearing to support the existence of statutory mental mitigating circumstances: Dr. Joseph Charles Wu, Dr. Jonathan Lipman, and Dr. Robert Berland. Robards and his sister Tanya also testified at the hearing.
Dr. Wu interpreted the results of a Positron Emission Tomography (PET) scan that was administered to Robards before trial. The doctor concluded that the scan showed evidence of three types of brain damage: traumatic brain injury, toxic brain exposure, and a combination of traumatic injury and toxic exposure. Dr. Wu found decreased activity in the back of Robards’ brain and observed that it “would be consistent with [Robards’] history of having been in multiple car accidents.... ” Dr. Wu also observed increased activity in Robards’ posterior cingulate which he associated with toxic brain exposure. Ro-bards’ overactive occipital cortex, Dr. Wu opined, was consistent with some forms of psychosis. Dr. Wu testified that the traumatic brain injury found in Robards’ PET scan represented a fourfold increase (from one percent to four percent) of the chance of developing a psychosis, and he noted that additional damage evident on the scan appeared to be caused by a combination of toxic exposure and traumatic injury.
Between the first and second phases of the Spencer hearing, Robards was evaluated by Dr. Lipman. Dr. Lipman testified that Robards displayed a number of physical manifestations of anabolic steroid use, including acne scarification, distinct features of Robards’ ear and nose cartilage, and the bony growth of Robards’ jaw. Ro-bards also had scars from the removal of large breasts that developed due to his steroid use. Robards began using steroids around age fifteen and graduated from *1265 using them in cycles to using them on a continuous basis. Dr. Lipman testified that Robards’ withdrawal from steroids could have lasted from ten days to four months and concluded that Robards would have been experiencing steroid withdrawal at the time of the homicides and possibly for weeks afterward because he did not have any steroids when he got out of jail just days before the murders.
Dr. Lipman interviewed people who knew Robards, and he described Robards as violent, destructive, combative, irritable, and fractious, such that protective orders had to be taken against Robards. When Dr. Lipman confronted Robards with these descriptions, Robards “had any number of explanations for why [Dr. Lipman’s] view of him was incorrect.” He described Ro-bards as paranoid in very subtle ways and testified that Robards reported symptoms consistent with psychotic hallucinations and delusions and paranoid fears. Dr. Lipman conceded that Robards’ steroid use was not a determinative justification for Robards’ acts of murder and agreed that Robards’ attempted escape from the State hospital in 2008 occurred long after Robards’ withdrawal symptoms would have passed.
Dr. Berland was hired by the Public Defender’s Office as Robards’ mental health expert. He administered the Minnesota Multiphasic Personality Inventory (MMPI) aloud to Robards in October 2006, and he scored the test himself. Dr. Berland concluded that the results reflected a substantial psychotic disturbance and that although the MMPI does not measure brain injury, Robards’ configuration of scores is consistent with people who “at least in part have their psychosis caused by brain injury.”
Dr. Berland interviewed seven people who knew Robards, including five former girlfriends and two family members. Each of them recalled various events involving Robards. Based on the interviewees’ accounts, Dr. Berland concluded that Robards exhibited behaviors that were consistent with a person who suffered from depression, experienced auditory hallucinations, and possessed prominent delusional paranoid beliefs.
During Robards’ testimony, he denied having any memory of the murders or the events surrounding them, and he insisted that his sophisticated attempt to escape from the State hospital in 2008 was simply an effort to get to the roof of the building to stargaze and pray. Although Robards said during the second phase of the hearing that he prayed for forgiveness, he refused to acknowledge that he murdered the Delucas and would not specify what he sought forgiveness for. However, during the third phase, where the Deluca family was not present, Robards apologized for murdering the Delucas. Robards’ sister Tanya testified that Robards was often the subject of physical abuse at the hands of their brothers and that she heard that Robards was once sexually abused as a child.
Robards’ sentencing was held on October 29, 2010. The trial court followed the jury’s recommendation and sentenced Ro-bards to death for each of the Delucas’ murders. In its sentencing order, the court found that four aggravating circumstances were proven by the State beyond a reasonable doubt and assigned each one of them great weight: (1) Robards was convicted of a prior capital felony (based on the contemporaneous murder of the second victim); (2) Robards committed each murder for pecuniary gain; (3) Robards committed each murder while engaged in a commission of a robbery (merged with pecuniary gain); and (4) each murder was especially heinous, atrocious, or cruel (HAC).
*1266 Although the jury did not receive evidence of mental health mitigation, the trial court weighed the evidence that was presented at the Spencer healing and considered as statutory mitigation the following: (1) whether Robards suffered from an extreme mental or emotional disturbance; and (2) whether Robards suffered from an impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. The court rejected both of these statutory mitigating circumstances and explained its rationale in its sentencing order. The trial court did weigh Robards’ mental health as a nonstatutory mitigating circumstance.
The trial court considered a total of twelve nonstatutory mitigating circumstances. The trial court rejected Robards’ argument that Florida’s budgetary crisis was a reason for not imposing the death penalty and his argument that the closeness of the jury’s vote was a reason for not imposing the death penalty. Of the remaining ten mitigating circumstances, the trial court gave each one some weight: (1) family history; (2) no plan to murder; (3) good general conduct while in custody; (4) capacity to form positive relationships; (5) remorse and potential for rehabilitation; (6) traumatic injury based on PET scan and PET scan brain image comparison; (7) effect of steroids on brain injury and effect of steroids generally; (8) use of prescribed steroids, interactions with other prescribed drugs, and withdrawal; (9) mental health issues; and (10) history of steady employment. All of the trial court’s findings were as to each murder.
Robards now challenges both his first-degree murder convictions and his death sentences and raises various issues for this Court’s consideration.
ISSUES ON APPEAL
Robards asserts four issues on appeal. First, he contends that his penalty phase counsel provided ineffective assistance that warrants relief on direct appeal. Second, he challenges the constitutionality of Florida’s death penalty and argues that jury recommendations of seven-to-five in favor of the death penalty are unconstitutional because they represent a bare majority of the jurors. Third, he contends that the trial court improperly suggested to the State that it seek the prior capital felony aggravating circumstance. Fourth, Ro-bards contends that the State’s closing argument during the guilt phase warrants a new trial. We address each of these issues in turn, and we conclude with our analysis of the sufficiency of the evidence and the proportionality of Robards’ death sentences.
Ineffective Assistance of Penalty Phase Counsel
Robards argues that his penalty phase counsel’s performance constituted ineffective assistance of counsel and that counsel’s performance was so egregious that it entitles him to relief on direct appeal. This Court normally considers the merits of ineffective assistance of counsel claims after a postconviction motion has been filed under the applicable rule of criminal procedure and ruled upon by the trial court following the completion of any necessary evidentiary proceedings.
Consequently, with only rare exception, ineffective assistance of counsel claims are not cognizable on direct appeal. See Martinez v. State, 761 So.2d 1074, 1078 n. 2 (Fla.2000); Kelley v. State, 486 So.2d 578, 585 (Fla.1986); State v. Barber, 301 So.2d 7, 9 (Fla.1974); see also Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla.1987). The reason that ineffective assistance of counsel claims are largely inappropriate on direct appeal is because “[a]n appellate court must confine itself to a review of only those questions which were *1267 before the trial court and upon which a ruling adverse to the appealing party was made.” Barber, 301 So.2d at 9. To that end, an ineffective assistance of counsel claim may be treated on the merits on direct appeal only in the “rare” instance where (1) the ineffectiveness is apparent on the face of the record, and (2) it would be “a waste of judicial resources to require the trial court to address the issue.” Blanco, 507 So.2d at 1384.
Without commenting on the merits of Robards’ claim that his penalty phase counsel provided ineffective assistance of counsel, we decline to consider this claim on direct appeal in order that such claims may first be properly raised, then developed and ruled upon in the trial court.
The Jury’s Bare Majority Vote
Robards’ next argument is that his death sentences are unconstitutional because each one was based on a seven-to-five bare majority recommendation by the jury. As a result, he argues, the jury’s recommendations were arbitrary and unreliable.
This Court has recently affirmed death sentences in other cases involving a seven-to-five jury recommendation of death. Like the present case, these cases also involved significant aggravation. See Peterson v. State, 94 So.3d 514, 537 (Fla.) (trial court finding CCP, HAC, and pecuniary gain aggravating circumstances, no statutory mitigating circumstances, and two nonstatutory mitigating circumstances), cert. denied, — U.S. -, 133 S.Ct. 793, 184 L.Ed.2d 586 (2012); Phillips v. State, 39 So.3d 296, 305-06 (Fla.2010) (trial court finding prior violent felony, murder committed during the course of a felony, and murder committed to prevent escape aggravating circumstances, no statutory mitigating circumstances, and several nonstatutory mitigating circumstances); Aguirre-Jarquin v. State, 9 So.3d 593, 600 n. 6 (Fla.2009) (trial court finding prior capital felony, murder committed during the commission of a burglary, and HAC aggravating circumstances, three statutory mental mitigating circumstances, and several nonstatutory mitigating circumstances); and Lebron v. State, 982 So.2d 649, 657 (Fla.2008) (trial court finding pri- or violent felony, murder committed for pecuniary gain, and murder committed during the course of a felony (merged with pecuniary gain) aggravating circumstances, no statutory mitigating circumstances, and several nonstatutory mitigating circumstances).
Moreover, we have also rejected the argument that seven-to-five jury recommendations are inherently unconstitutional. See Davis v. State, 859 So.2d 465, 479 (Fla.2003) (“This Court has repeatedly rejected Davis’s argument and held that a capital jury may recommend a death sentence by a majority vote.”); Thompson v. State, 648 So.2d 692, 698 (Fla.1994) (“The sixth and final penalty phase issue raised by Thompson is whether it is unconstitutional for a jury to be allowed to recommend death on a simple majority vote. Thompson admits that this issue has already been decided by this Court contrary to his position.”).
Because we have consistently affirmed other death sentences where the jury’s recommendation was based on a seven-to-five vote and because we have rejected arguments against the constitutionality of such jury recommendations, we also conclude here that Robards’ claim is without merit.
Prior Capital Felony Aggravating Circumstance
Robards also argues that the trial court improperly suggested that the State pursue an aggravating factor that it had not previously listed in its notice of. aggrava *1268 ting circumstances — the prior capital felony aggravating circumstance in each of the Delucas’ murders — based on the contemporaneous murders of the second victim. Before trial, the defense moved for the State to disclose the aggravating circumstances on which it would rely during the penalty phase, and the trial court granted the defense’s motion. The State complied on May 14, 2010, by filing a “Notice of Aggravating Circumstances” that listed three aggravating circumstances: (1) murder committed in the course of a robbery or burglary; (2) murder committed for pecuniary gain; and (3) HAC. At a pretrial hearing that was held on the same day that the notice was filed, the following discussion occurred:
THE COURT: Okay. All right. And then the only other question that I had — I really don’t want to give the State or defense or anyone any additional ideas. But after I went through the affidavit and the case law on that I thought that another prior aggravating factor may be previous conviction of capital or violent felony because of the alleged contemporaneous murder of the other person. Are you going to be asking for that or not?
MR. SCHAUB: I don’t know yet.
THE COURT: All right.
MR. SCHAUB: ■ I’ll let you know on that.
THE COURT: All right. And, I’m not saying that you should. I’m just saying that, you know, I went through everything, and I was trying to think of what the possible aggravating circumstances and mitigating circumstances would be.
MR. SCHAUB: Danger to other based upon an arson theory.
THE COURT: Well, I didn’t think of that one. All right. So anything else we need to- talk about at this point.
At that point, the court and the attorneys continued to discuss another matter unrelated to aggravating or mitigating circumstances. Three days later, the State filed a second notice that added as a fourth aggravating circumstance the prior conviction of a capital felony or felony involving use or threat of violence. Robards’ trial began the next day.
As noted by the State, Robards did not object to the addition of the fourth aggravating circumstance. Moreover, Ro-bards did not seek to have the trial judge disqualified from the case on the grounds of lack of impartiality. As a result, this claim is unpreserved. See McKenzie v. State, 29 So.3d 272, 279 (Fla.2010) (concluding that the appellant’s claim of departure from judicial impartiality was not preserved where the alleged conduct was not objected to nor was it the grounds for a motion to disqualify the trial court). Consequently, Robards is only entitled to relief if he demonstrates fundamental error.
Generally, the State is not required to provide notice of aggravating circumstances that it intends to prove. See Lynch v. State, 841 So.2d 362, 378 (Fla.2003). Given that the State is limited to the statutory aggravating circumstances listed in section 921.141(5), Florida Statutes, this Court has rejected the argument that the death penalty scheme is unconstitutional because it fails to require specific notice. See id. (citing § 921.141(5), Fla. Stat. (1987)). However, in this case, the trial court granted Robards’ motion to have the State specify the aggravating circumstances it intended to prove and consequently, it required the defense to specify which mitigating circumstances it intended to pursue.
Robards has not demonstrated fundamental error. The defense received an amended notice of aggravating circumstances before trial. Moreover, in order to *1269 prove the prior capital felony conviction based on Robards’ contemporaneous murder of the second victim, the State first had to prove that Robards murdered both Frank and Linda Deluca. Therefore, the basis of the aggravating circumstance in question is Robards’ guilt or innocence of first-degree murder. While we strongly caution the trial court that it must remain neutral and avoid any appearance of partiality to any party, we conclude that Ro-bards is not entitled to relief on this claim.
Guilt Phase Closing Argument
Robards’ last argument is that improper argument by the prosecutor warrants a new guilt phase proceeding. He contends that certain comments made by the prosecutor during closing argument constitute impermissible argument that entitles him to a reversal of his first-degree murder convictions. Robards argues that each of the comments either shifts the burden of proof to the defense or comments on evidence not introduced at trial. He also argues that the cumulative effect of objected-to and unobjected-to comments entitles him to relief. “Prosecutorial improprieties ‘must be viewed in the context of the record as a whole to determine if a new trial is warranted.’ ” LaMarca v. State, 785 So.2d 1209, 1214 (Fla.2001) (quoting Sired v. State, 587 So.2d 450, 452 (Fla.1991)). As we explain below, Robards has failed to demonstrate that he is entitled to a new guilt phase.
Three of the comments that Robards contends were improper relate to defense counsel’s attempts to discredit the newspaper found in the Delucas’ home that contained three of Robards’ latent prints. The prosecutor argued:
Now they don’t have to prove anything to you. What did they say they were going to do, raise reasonable doubt, raise reasonable doubt. Well, that newspaper, that newspaper dated the day before this crime, they’re going to raise reasonable doubt. Don’t you think if someone saw — someone gives him a newspaper to read the day before you would hear that testimony? You haven’t heard that testimony because it doesn’t exist.
Defense counsel objected on the grounds of burden shifting and commenting on Ro-bards’ failure to take the stand. He moved for mistrial and, in the alternative, a curative instruction. The trial court denied the motion for mistrial but gave the jury a curative instruction reminding the jury that the burden of proof belonged to the State. The prosecutor continued:
The defense wants you to believe that somebody planted that newspaper. There’s no evidence of that. There’s no evidence whatsoever that somebody gave him a newspaper the day before and said, put your fingerprints on here so I can plant evidence [for] you.
The defense objected again, and counsel approached the bench. The court concluded that the State was entitled to indicate that an argument was speculative. The court said:
How is that if the defense makes an argument as far as making a speculative argument as to this may have occurred, I don’t think that there’s a problem with the State indicating that it is speculation. That there’s no evidence • of it. Obviously, they can’t go further and say that the defense could have put someone on. That’s another thing.
The judge clarified that he was overruling the objection as to what the prosecutor actually said but was sustaining the .objection as to any suggestion by the prosecutor that the defense could have put a witness on the stand to support its argument. Immediately, the prosecutor continued:
*1270 There’s no evidence of that. Recall the evidence in this case. The evidence comes from the witness stand and the evidence comes from the evidence that’s been submitted during the course of this trial. There’s no evidence that someone planted evidence in this case, i.e., the newspaper.
This statement was made without objection, but Robards asserts that it is improper comment on Robards’ failure to testify.
First, we conclude that the trial court did not abuse its discretion when it denied Robards’ motion for mistrial. See Salazar v. State, 991 So.2d 364, 371-72 (Fla.2008) (“We have repeatedly held that this Court reviews a trial court’s ruling on a motion for mistrial under an abuse of discretion standard.”). We reiterate that the trial court has broad discretion in ruling on a motion for mistrial, and in order to conclude that an abuse of discretion occurred, the prosecutor’s statements must have been so prejudicial as to vitiate the entire trial. See Ford v. State, 802 So.2d 1121, 1129 (Fla.2001). As we have stated:
In order for the prosecutor’s comments to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.
Spencer v. State, 645 So.2d 377, 383 (Fla.1994). The trial court properly gave a curative instruction reminding the jury that the State has the sole burden of proof, and a mistrial was not warranted.
Second, we agree with the trial court that the prosecutor was responding to argument proposed by the defense. Close examination of the entire closing argument demonstrates that these comments addressed theories that were raised during the defense cross-examination of the State’s witnesses and during closing argument but were never contradicted with evidence. In Caballero v. State, 851 So.2d 655 (Fla.2003), the prosecutor argued during closing argument that the defense argument was uncontradicted. Defense counsel objected to the labeling of the argument as uncontradicted and asserted that the comment shifted the burden of proof to the defense. Although this Court noted that any comment that can be reasonably interpreted as a comment on the defendant’s right to remain silent must be avoided, we rejected Caballero’s claim that the prosecutor’s statement created such an error and said: “[I]t is permissible for the State to emphasize uncontradicted evidence for the narrow purpose of rebutting a defense argument since the defense has invited the response.” Id. at 660.
During the examination of the forensic science specialist who retrieved Robards’ prints from the newspaper and the latent print examiner who matched the prints to Robards’ known prints, defense counsel’s questions attempted to cast doubt on Ro-bards’ guilt because the other newspapers were burned and unable to be tested for fingerprints. Counsel sought to lessen the impact of the newspaper and fingerprint evidence by arguing that Robards’ fingerprints were only found on one page of the paper. It was essential that the defense try to discredit the newspaper evidence because it placed Robards at the crime scene on July 31 or August 1 and linked him to a crumpled piece of newspaper in a home that was intentionally set ablaze by someone who used newspapers and other items to help the fire spread. Consequently, as in Caballero, because the defense line of questioning invited the prosecutor’s argument that Robards’ prints on *1271 the newspaper constituted uncontradicted evidence, the argument was not improper.
Robards also contends that the following comment constituted an improper comment on evidence not admitted in court:
Now, Mr. Hoffman would make it sound like who committed — the person who committed this crime had to be the world’s craziest, dumbest individual. Let me introduce you to the world’s dumbest individual, Richard T. Robards, because he committed this crime in Clearwater, and the Clearwater Police Department did one heck of a job. They truly, truly, truly did.
Think about it, all the evidence, all the work that they did during this investigation. And we didn’t even show you all of it. We would have been here forever. You know how hard they worked this case. And it was their hard work and their evidence and their efforts that found all of this evidence and put this case together.
Heck they build the plane. We only fly it. And that’s the easy part. They put this case together. And he committed this crime in their backyard. And they worked it and worked it and worked it, and they found evidence and evidence and evidence.
Defense counsel did not object to this comment. As such, Robards is only entitled to relief if the comment constituted fundamental error. We have consistently observed fundamental error as the type of error that “reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.” Brooks v. State, 762 So.2d 879, 899 (Fla.2000) (quoting McDonald v. State, 743 So.2d 501, 505 (Fla.1999)). Although this comment might be construed in isolation as a comment on evidence not properly admitted in court for proper consideration by the jury, when viewed in context, the prosecutor was emphasizing the scope of the Deluca homicide investigation and the volume of evidence of Robards’ guilt. Because of the way that the comment could be construed, however, it is ill-advised. We are convinced, though, that'in light of the overwhelming evidence of Robards’ guilt, the prosecutor’s comment was not such that Robards could not have been convicted without it. Consequently, the prosecutor’s comment does not warrant relief.
We also reject Robards’ argument that the cumulative effect of the prosecutor’s objected-to and unobjected-to comments warrant relief. In light of the record in this case, this argument is without merit. There is overwhelming evidence linking Robards to the Delucas’ murders. Among the more substantial evidence is that Ro-bards’ fingerprints were found at the crime scene on a piece of newspaper dated within one day of the murders. What is more, Frank Deluca tried to fight his attacker, and Robards’ DNA was found underneath his fingernails. The only other DNA that was identified during the fingernail analysis of Frank Deluca was that of the other murder victim, Frank Deluca’s wife. Additionally, Robards talked about the Delucas’ safe for weeks before the murders, told many people that he had access to it, and tried to recruit help from Shane Harper to steal it. Then, after Robards murdered the Delucas, he made Robert Kenney an unwitting partner in removing the safe from the Delucas’ home. In light of such compelling evidence of guilt, Robards is not entitled to relief.
Sufficiency of the Evidence
Although Robards does not challenge the sufficiency of the evidence in this case, we now, because we are required to do so in every death penalty direct *1272 appeal, evaluate whether the evidence presented at trial was sufficient to justify Robards’ convictions for first-degree murder. This Court must independently evaluate each death sentence for the sufficiency of the evidence relied upon to convict the defendant. See Caylor v. State, 78 So.3d 482, 500-01 (Fla.2011), cert. denied, — U.S. -, 132 S.Ct. 2405, 182 L.Ed.2d 1042 (2012). “In conducting this review, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Id. at 501 (quoting Rodgers v. State, 948 So.2d 655, 674 (Fla.2006) (citing Bradley v. State, 787 So.2d 732, 738 (Fla.2001))). We conclude that there was sufficient evidence for the jury to find that Robards committed both murders.
Robards discussed for weeks, if not months, before the murders, his desire to obtain the Delucas’ safe, and he knew that there was a substantial amount of money inside of it. At one point, he discussed with Shane Harper his plans to steal the safe and unsuccessfully tried to recruit Harper to be his getaway driver. The morning of the murders, Robards borrowed Robert Kenney’s Explorer and rented a dolly to remove the safe from the Delucas’ home. When these measures were deemed inadequate, Robards enlisted Kenney’s help and rented a trailer to remove the safe.
Additionally, Robards’ fingerprints were found on a newspaper at the crime scene that was dated within one day of the murders. A rifle that belonged to Frank Delu-ca was found in Robards’ storage unit, and shortly after the murders, Robards gave Shane Harper a scale that was taken from the Delucas’ home.
Linda Deluca’s purse was found in a load of cardboard recycling along with a Dimmit Automotive t-shirt, and Robards owned several Dimmit Automotive t-shirts because of his employment there two months before the murders. A handgun identified as likely having belonged to Linda Deluca was found by Robert Kenney. The handgun was hidden in a suitcase in the same garage where Robards hid the Delucas’ safe.
Moreover, Robards’ blood was later found on a doorknob to a motel room that he stayed in from July 22 until August 3, 2010. Towels, among the items used to fuel the fire in the Delucas’ home, were noticeably missing from the room after Robards’ stay there.
And, DNA evidence linked Robards to the murder of Frank Deluca, whose fingernails contained DNA that was consistent with Robards’ DNA profile. Frank Deluca tried in vain to fight his attacker with his hands and sustained defensive wounds as a result. Because competent substantial evidence supports each of Robards’ convictions for first-degree murder, we affirm Robards’ convictions.
Proportionality of Robards’ Death Sentences
Although Robards seeks a new penalty phase on the grounds of ineffective assistance of penalty phase counsel, he does not challenge the proportionality of his death sentence. However, “[b]ecause death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.” Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (internal citation omitted). We conclude that Robards’ death sentences are proportional to similar *1273 cases where we have affirmed the sentence of death.
As to each murder Robards committed, the trial court found the existence of the following aggravating circumstances: prior violent felony based on the contemporaneous murder of the second victim, pecuniary gain, and HAC. HAC has been repeatedly identified by this Court as one of “the most serious aggravators set out in the statutory sentencing scheme.” Larkins v. State, 739 So.2d 90, 95 (Fla.1999). The court also found that the murders were committed during the course of a robbery, although it properly merged that aggravating circumstance with pecuniary gain.
In Lynch v. State, also a case involving a double homicide, this Court upheld the appellant’s death sentences. As to each of the murders, the trial court found three aggravating circumstances, which like the present case, included the existence of a prior violent felony. Id. at 368. The court also found that HAC applied to one of the murders. Id. In Lynch, even though the trial court also found one statutory mitigating circumstance and eight nonstatuto-ry mitigating circumstances, this Court concluded that the death sentences were proportional. 841 So.2d at 377, 377 nn. 8-9. As in Robards’ case, Lynch murdered the two victims at their home. Id. at 366-67.
This Court has affirmed death sentences in other cases of double homicide and has done so in cases where, like Lynch and unlike the present case, the trial court actually found statutory mitigating circumstances in addition to the aggravating circumstances and nonstatutory mitigating circumstances. See Aguirre-Jarquin, 9 So.3d at 600 n. 6 (upholding death sentence in double homicide where the trial court found three aggravating circumstances for one murder and five for the other, and three statutory mitigating circumstances and five nonstatutory mitigating circumstances were applicable to the murders of both victims); Smithers v. State, 826 So.2d 916, 931 (Fla.2002) (upholding death sentence in double homicide where two aggravating circumstances (pri- or violent felony and HAC), two statutory mitigating circumstances, and seven non-statutory mitigating circumstances were applicable to the second victim); Morton v. State, 789 So.2d 324, 328-29 (Fla.2001) (upholding death sentence in double homicide where three aggravating circumstances (CCP, avoiding arrest, and murder committed while engaged in a felony), two statutory mitigating circumstances, and five nonstatutory mitigating circumstances were applicable to one victim); and Robinson v. State, 761 So.2d 269, 272-73 (Fla.1999) (upholding death sentence where the trial court found three aggravating circumstances (pecuniary gain, avoiding arrest, and CCP), two statutory mitigating circumstances, and eighteen nonstatutory mitigating circumstances). Because Ro-bards’ death sentences are proportional, we affirm.
CONCLUSION
Therefore, having considered all of Ro-bards’ claims, we affirm his convictions and sentences.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs with an opinion.
LABARGA, J., concurs with an opinion, in which PARIENTE, QUINCE, and PERRY, JJ., concur.

. Spencer v. State, 615 So.2d 688 (Fla.1993).