# Supreme Court of Florida

_____

No. SC13-6
_____

**WILLIAM ROGER DAVIS, III,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[October 9, 2014]

PER CURIAM.

William Roger Davis, III, who was thirty-one years old at the time of the crime, was found guilty of the October 2009 first-degree murder, kidnapping, and sexual battery of nineteen-year-old Fabiana Malave. In this proceeding, Davis appeals only the death sentence imposed by the trial court for this murder and not the underlying convictions. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Davis's convictions for first-degree murder, kidnapping, and sexual battery, and we affirm his sentence of death.

## FACTS AND PROCEDURAL HISTORY

Davis pled not guilty to the crimes charged and put forth an insanity defense during the guilt-phase proceedings, in which the following evidence was presented regarding Malave's kidnapping, sexual battery, and murder. Most of the facts came from Davis himself, who confessed to each of these crimes.

**The Guilt Phase**

Around 11:30 a.m. on the morning of October 29, 2009, Davis arrived at Super Sport Auto, in Seminole County, Florida, purportedly to pick up the title to a vehicle he had recently purchased from the dealership. Davis did not park at Super Sport Auto, but parked instead at the Post Time Lounge, a nearby business, and walked to the dealership. Fabiana Malave, who worked at Super Sport Auto, was the only employee at the dealership when Davis arrived. When Davis asked her for the title to his recently purchased vehicle, she called Jose and Rosa Hernandez, the co-owners of Super Sport Auto, who told her that Rosa would be at the dealership in about twenty-five minutes with the title.

After Malave got off the phone and informed Davis that Rosa or Jose would be coming to the dealership later, Davis grabbed her by the back of the neck, showed her a steak knife that he had brought with him, and walked her out of the dealership, threatening to kill her if she screamed. Davis would later repeat this threat during the course of the crimes. Davis took the victim to her own car and forced her into it. Davis then drove the victim's car to the Post Time Lounge,

where he backed her car into the parking spot directly next to where he had parked his own car earlier that morning. At that point, Davis removed the victim from her car and told her to lie down in the backseat of his car. Davis subsequently drove his car home, with the victim lying down as instructed.

When Davis arrived at his home, he brought the victim into his bedroom and, once inside, told her to remove her clothing. After she acquiesced, Davis sexually battered her and forced her to perform oral sex on him. Following the sexual battery, the victim asked if she could put her clothes back on, and Davis allowed her to do so. Once the victim was clothed, Davis instructed her to lie face down on his bed, where Davis choked her to death from behind by putting her into a choke hold using his forearm and elbow.

At trial, the medical examiner substantiated Davis's account of the cause of death. The medical examiner testified that hemorrhaging of the muscles in the front of the victim's neck and along her spine, bloody contusions of the upper portion of the victim's esophagus, and fluid buildup in the victim's lungs and airway showed that she died of asphyxiation caused by strangulation from a choke hold.

After killing the victim, Davis wrapped her body in an orange blanket, covered her head with black plastic, and put her body into the backseat of his car. Davis then drove around for several hours with the victim's body in his backseat

before ultimately deciding to return to the parking lot of the Post Time Lounge, where the victim's car was still parked.

Following Davis's abduction of the victim from Super Sport Auto, co-owner Rosa arrived at the dealership at about 12:10 p.m., where she found the door to the office unlocked and noticed that the victim's car and personal belongings were missing. During the following hours, Rosa attempted to call Davis several times in order to determine whether he had any information regarding the victim's whereabouts. However, Rosa's calls went unanswered. At about 5:30 p.m. that evening, the other co-owner, Jose, called the police regarding the victim's disappearance, and the police arrived at Super Sport Auto shortly thereafter.

While talking to the police officers at Super Sport Auto, Jose saw Davis's car drive past the dealership. Jose recognized Davis's car from when he sold the vehicle to Davis because it had a large dent on the side. Jose and the officers pursued Davis in order to question him about the victim's whereabouts. When Jose saw Davis pull into the Post Time Lounge parking lot, he flagged down an officer and blocked in Davis's car with his own car. Jose found that Davis had backed his vehicle into a spot next to where the victim's car was parked. When Jose confronted Davis, Davis "smiled at [Jose] like [Jose] was his best friend," but when a police officer arrived about forty-five seconds later, Davis's face went

"blank." When confronted by the police officer, Davis asked the officer to arrest him.

Officers checked Davis's vehicle for any sign of the victim, discovering her body in the backseat covered by an orange blanket and her head covered in black plastic. One officer checked the victim's vital signs, but found no indication of life. When paramedics arrived, they confirmed that the victim was dead.

Later that evening, Investigator Robert Hemmert arrived at the Post Time Lounge parking lot where police were holding Davis. Shortly after his arrival, Investigator Hemmert conducted a recorded interview with Davis, in which Davis admitted to kidnapping, sexually battering, and murdering the victim and described the events in great detail. Davis stated to Investigator Hemmert that he had never killed anyone before, but that he found the murder "interesting" and "liberating" and that he would certainly kill again. When asked why he committed the murder, Davis stated that he "kind of tried to figure out a way to . . . die by suicide by cop." Additionally, when asked if he felt any remorse for the murder, Davis stated that he felt "zero" remorse and explained that he hoped the killing would be considered capital murder so that he could be executed.

After the murder, Catherine Johnson, a crime scene analyst for the Florida Department of Law Enforcement, compared Davis's DNA, which she obtained from a buccal swab taken from Davis, with DNA found on a vaginal swab of a

sexual assault kit that was administered to the victim after her death. The DNA found on the vaginal swab matched Davis at all thirteen loci—a result that would be obtained by only 1 in 350 trillion Caucasians, 1 in 22 quadrillion African Americans, and 1 in 420 trillion Southeastern Hispanics. Further, Johnson testified at trial that skin cells found on Davis's sheets in his home matched the victim's DNA at six of thirteen loci—a result that would be obtained by only 1 in 1.6 million Caucasians, 1 in 12 million African Americans, and 1 in 2.1 million Southeastern Hispanics—and that skin cells found under the victim's nails matched Davis at four of thirteen loci—a result that would be obtained by 1 in 8 Caucasians, 1 in 51 African Americans, and 1 in 10 Southeastern Hispanics. Johnson's DNA testing substantiated Davis's prior admission that the victim had scratched the back of his neck in an effort to stop Davis as he was choking her.

Although Davis did not dispute that he kidnapped, sexually battered, and murdered the victim, he contended at trial that he was insane at the time of these offenses. In support of this defense, Davis relied on a second recorded conversation he had with Investigator Hemmert several days after the murder, as well as on the testimony of Dr. Charles Golden, a forensic psychologist and mental health expert witness for the defense.

Specifically, at Davis's request, Investigator Hemmert met with Davis for a second time on November 2, 2009. During this meeting, Davis explained to

Investigator Hemmert why he committed the murder. Davis stated that prior to the date of the crimes, he had been in a relationship with a woman named Jody. Davis explained that days before the murder, a hallucinatory figure named "Dr. Paul" came to him and told him that if he wanted to keep Jody and her son safe, he would need to abduct one of three women, whose pictures "Dr. Paul" showed to Davis, and bring this woman to his house on October 29. Davis stated that he abducted the victim based upon this command and that he later sexually battered and murdered her at the direction of "Dr. Paul." During this interview, Davis explained that he could not bring himself to kill the victim and that "Dr. Paul" likely committed the murder while Davis was out of the room.

Dr. Golden testified during the guilt-phase proceedings as an expert witness on Davis's behalf. Dr. Golden diagnosed Davis with bipolar disorder and stated that Davis suffered both severe manic events and severe depressive events. He also testified that Davis's bipolar disorder caused Davis to suffer from psychosis. Further, Dr. Golden diagnosed Davis with borderline personality disorder based on his childhood history of abandonment by his parents and verbal and physical abuse by Davis's bipolar father.

Dr. Golden administered an IQ test to Davis, which revealed that Davis had an IQ of 127, just three points below genius level. Additionally, Dr. Golden admitted that, although objective psychological testing indicated that there was a

possibility that Davis was exaggerating his symptoms of mental illness, Davis's answers on the psychological test were completely consistent with his psychological history.

Despite acknowledging that he was unsure about the veracity of Davis's claim that he was experiencing visual and olfactory hallucinations when he murdered the victim, Dr. Golden testified that it was his expert opinion that Davis committed the murder based upon a delusion and in response to auditory hallucinations. Dr. Golden concluded that, although Davis knew what he was doing when he murdered the victim, Davis did not think what he was doing was wrong. Relying on Dr. Golden's evaluation, Davis asserted that he satisfied Florida's insanity standard.

In rebuttal to Dr. Golden's testimony, the State called two expert mental health witnesses, Dr. Daniel Tressler and Dr. William Riebsame, both of whom testified that Davis did not satisfy Florida's insanity standard at the time of the offenses. Dr. Tressler diagnosed Davis with bipolar disorder, polysubstance dependence, and antisocial personality disorder. However, Dr. Tressler, in addressing Davis's claim that "Dr. Paul" directed him to murder the victim, stated that it was extremely difficult to conclude that Davis's reported hallucinations were a legitimate set of symptoms or that his behavior was substantially influenced by a multi-sensory hallucination because Davis's reported hallucinations were not

symptomatic of any mental health problem Davis was known to have. Dr. Tressler also testified that it was his opinion, based upon objective testing, that Davis was substantially overreporting his symptoms of mental illness during testing and that he was not as mentally ill as he wished to appear.

Dr. Riebsame reached essentially the same conclusions as Dr. Tressler, stating that although Davis likely suffered from bipolar disorder and a personality disorder with antisocial and borderline characteristics, Davis's hallucinations were contrived and were not consistent with typical hallucinatory phenomena. Dr. Riebsame noted that psychological testing suggested that it was possible that Davis was exaggerating his mental illness and that there was a correlation between when Davis reported psychological problems and when he could use them to his advantage.

After considering the testimony, the jury rejected the insanity defense and convicted Davis of first-degree murder, kidnapping, and sexual battery.

**The Penalty Phase**

During penalty-phase proceedings, the medical examiner testified regarding the circumstances surrounding the victim's death. The medical examiner stated that once a victim's vascular structures are occluded due to being choked, the victim will likely lose consciousness after about ten to thirteen seconds. However,

the medical examiner noted that it would likely take about three minutes after the victim lost consciousness before the victim would die from oxygen deprivation.

The State also called two probation officers from the Florida Department of Corrections to prove that Davis was on felony probation when he committed the murder in this case. Opal Badie, Davis's second probation officer, testified that at the time he murdered the victim, Davis was on probation for three felony offenses: (1) burglary with assault; (2) armed false imprisonment; and (3) aggravated assault.

Michael Hurst Redden, the female victim of the crimes for which Davis was on felony probation at the time of the murder, testified as to the circumstances surrounding those crimes, which stemmed from two separate occurrences. In 2002, Redden, who was married but had recently separated from her husband, met Davis, and the two started dating. This relationship eventually ended, and in February 2003, Davis broke into Redden's apartment, physically assaulted her when she arrived home, and forced Redden to have oral and vaginal sex with him. Davis received probation for this offense. However, while on probation, Davis met Redden in a Walmart parking lot, put a knife to her throat, and forced her into her car. Davis ordered Redden to drive off, but she escaped and reported Davis's actions to the police.

In penalty-phase mitigation, Davis testified on his own behalf and presented three lay witnesses, in addition to Dr. Jeffrey Danzinger, an expert mental health witness who testified as to Davis's mental state at the time of the murder. Barbara Shoop, Davis's mother, testified about his childhood. Shoop testified that Davis's father would mentally abuse her and force her to have sex with him. She also explained that, at one point after she was divorced from Davis's father, Davis's father sent Davis to visit her in California, but after Davis returned home, she found out that Davis's father had actually wanted Davis to live with her permanently.

Annette Davis, Davis's stepmother, testified that Davis's father had mental health problems and was physically violent with both her and Davis. She stated that, eventually, Davis's father received medication for his mental condition, which substantially improved his temperament. Finally, John Sink, Davis's step-grandfather, testified that Davis had become religious while in prison and attended church and bible study.

Davis also testified on his own behalf. He stated that he had a rocky relationship with his father and that when he was younger, his father would take him outside and beat him. Further, Davis testified that he suffered severe mood swings in high school, which escalated to suicidal thoughts when he joined the army after graduation. Davis explained that although he had been prescribed

- 11 -

different medications throughout his life for his mental health problems, he always stopped taking the medications because his upbringing forced him to see medication as a weakness and also because the medications were very expensive. Davis explained that he had not been on medication for thirteen months prior to committing the murder, and that if he had been on medication at that time, the crimes would have never occurred. Davis concluded by stating that he believed the jury should recommend a death sentence.

Dr. Danzinger testified with respect to whether Davis committed the murder while under the influence of an extreme mental or emotional disturbance. Although Dr. Danzinger thought Davis's account that he committed the murder at the behest of a command hallucination was not plausible—and thus, that Davis was not legally insane at the time of the murder—Dr. Danzinger nonetheless believed that Davis was under the influence of an extreme mental or emotional disturbance when he committed the murder. Dr. Danzinger diagnosed Davis with bipolar disorder, substance abuse disorder, and a personality disorder that included antisocial and borderline personality characteristics.

In support of his contention that Davis committed the murder while under the influence of an extreme mental or emotional disturbance, Dr. Danzinger relied in large part on Davis's history of mental illness, which began in 1997 when Davis threatened suicide while enlisted in the army and included multiple diagnoses of

bipolar disorder, both in prison and in the general community. Dr. Danzinger noted that over the years, Davis was prescribed many different medications in order to control his bipolar disorder. Based upon this history and the fact that Davis had not been medicated for thirteen months prior to the murder, Dr. Danzinger testified that at the time of the crimes, Davis was likely agitated and depressed. This mental state was likely caused by Davis's recent rejection by Jody, a claim that Dr. Danzinger premised on a letter Davis wrote to Jody days before the murder. Dr. Danzinger testified that Davis's mental condition was illustrated by the fact that he did not try to hide the body and that he expressed a desire to die during his initial interview with Investigator Hemmert on the night of the murder.

In rebuttal, the State called Dr. Riebsame, who had previously testified for the State during the guilt-phase proceedings, to testify as to whether Davis was under the influence of an extreme mental or emotional disturbance at the time of the murder. Dr. Riebsame stated that he placed great weight on Davis's initial recorded interview with Investigator Hemmert on the night of the murder. Although Dr. Riebsame admitted that Davis had a history of mental illness, he testified that Davis's recorded statement on the night of the murder, in which Davis coherently provided a detailed explanation of the crimes, showed that Davis was

not under the influence of an extreme mental or emotional disturbance at the time of the murder.

At the close of penalty-phase proceedings, the jury recommended the death penalty by a vote of seven to five. The trial court followed this recommendation, finding the following six aggravating circumstances, all of which it assigned great weight: (1) Davis was on felony probation when the murder was committed; (2) Davis was previously convicted of a felony involving the use or threat of violence to another person; (3) the murder was especially heinous, atrocious, or cruel (HAC); (4) the murder was committed in the course of committing sexual battery or kidnapping; (5) the murder was committed to avoid arrest; and (6) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The trial court found no statutory mitigating factors, specifically rejecting the statutory mitigating circumstance that Davis committed the murder while under the influence of an extreme mental or emotional disturbance. The trial court did, however, find six nonstatutory mitigating circumstances: (1) Davis suffers from long-term chronic mental health problems (some weight); (2) Davis can be properly treated with medication (some weight); (3) Davis is able to currently adapt to imprisonment (little weight); (4) Davis is able to hold employment (some weight); (5) Davis showed remorse for the

murder (some weight); and (6) Davis showed appropriate courtroom demeanor (substantial weight).

Ultimately, the trial court determined that the aggravating circumstances outweighed the mitigating circumstances and sentenced Davis to death. This appeal followed.

## ANALYSIS

On appeal, Davis raises seven claims, all of which are related only to the propriety of the death sentence: (1) the trial court failed to remain neutral during the penalty-phase proceedings; (2) the trial court erred in rejecting the statutory mitigating circumstance that Davis committed the murder while under the influence of an extreme mental or emotional disturbance, and the trial court erred in weighing nonstatutory aggravating circumstances; (3) the trial court erred in finding the CCP aggravating circumstance; (4) the trial court erred in finding the avoid arrest aggravating circumstance; (5) the trial court erred in giving the standard jury instruction defining the HAC aggravating circumstance; (6) the trial court erred in denying relief based on Ring v. Arizona, 536 U.S. 584 (2002); and (7) the death penalty is not proportionate in this case. In addition to the issues raised by Davis, this Court must consider whether the evidence was sufficient to support Davis's convictions. We address each issue in turn, beginning with our mandatory review of the sufficiency of the evidence.

## I. Sufficiency of the Evidence

At the outset, although Davis does not contest the sufficiency of the evidence supporting his convictions, we address this issue because this Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Jones v. State, 963 So. 2d 180, 184 (Fla. 2007); see also Fla. R. App. P. 9.142(a)(5) ("On direct appeal in death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief."). In reviewing the sufficiency of the evidence, the question is whether, "after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).

In this case, the record contains sufficient evidence to support Davis's convictions for kidnapping, sexual battery, and first-degree murder. On the night of the murder, Davis confessed to kidnapping, sexually battering, and murdering the victim in a recorded statement made to Investigator Hemmert. In his statement, Davis described the events leading up to the murder in great detail and explained how he committed the crimes. This statement was admitted as substantive evidence during the guilt-phase proceedings.

Additionally, police found the victim's body in Davis's car parked in the Post Time Lounge parking lot with Davis nearby; Davis's DNA was found on a vaginal swab that was administered to the victim after her death; the victim's skin cells were found on Davis's bed sheet that was recovered from his home; and Davis's skin cells were found under the victim's fingernails. Based on a complete review of the evidence presented in this case, a "rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons, 934 So. 2d at 1111. Thus, there was sufficient evidence to support Davis's convictions for kidnapping, sexual battery, and first-degree murder.

Accordingly, we affirm the convictions. We now proceed to address each of Davis's seven penalty-phase claims, beginning with the trial court's alleged failure to remain neutral.

## II. Trial Court's Failure to Remain Neutral

In this claim, Davis argues that the trial court failed to remain neutral during the penalty phase of his trial by suggesting to the State that it pursue the avoid arrest aggravating circumstance during a jury instruction conference held on the morning of penalty-phase closing arguments. Davis contends that the State did not intend to pursue this aggravating circumstance until it was suggested by the trial court.

Before trial, the trial court ordered the State to provide defense counsel with notice of the aggravating factors that it planned to establish in seeking the death penalty. In compliance with this order, the State filed its Notice of Aggravating Circumstances on two separate occasions prior to the commencement of the guilt-phase proceedings. Although the State ultimately sought the avoid arrest aggravating circumstance during the penalty phase, the State did not list the avoid arrest aggravator in either of its notices before trial.

In support of his claim that the trial court failed to remain neutral, Davis relies on this Court's decision in Robards v. State, 112 So. 3d 1256, 1268 (Fla. 2013), in which this Court addressed a situation where a trial court suggested an aggravating circumstance that the State had not considered. The State subsequently amended its Notice of Aggravating Circumstances to add the newly suggested aggravating circumstance. Id. This Court "strongly caution[ed] the trial court that it must remain neutral and avoid any appearance of partiality to any party," but held that the trial court's actions did not amount to fundamental error. Id. at 1268-69.

Davis's claim, however, is quite different than the claim raised by the defendant in Robards. Contrary to Davis's assertions, we do not conclude in this case that the trial court suggested that the State pursue the avoid arrest aggravator. A careful reading of the portion of the trial transcript upon which Davis relies

shows that the trial court was actually referencing a set of proposed jury instructions during its discussion of the avoid arrest aggravator and did not, on its own volition, suggest to the State that it should pursue this aggravating circumstance. The trial court's discussion of the applicability of the avoid arrest aggravator was predicated upon the existence of a set of jury instructions that included an instruction on that aggravator.

Because the trial court did not suggest that the State pursue the avoid arrest aggravator, but instead, merely discussed the applicability of the avoid arrest jury instruction included in proposed jury instructions, this case is distinguishable from Robards. Accordingly, we hold that the trial court did not fail to remain neutral during Davis's penalty-phase proceedings and reject this claim.

### III. Trial Court's Findings on Aggravators and Mitigators

Davis next challenges several of the trial court's findings with respect to aggravating and mitigating circumstances. Specifically, Davis contends that the trial court erroneously rejected the statutory mitigating circumstance that he committed the murder while under the influence of an extreme mental or emotional disturbance, improperly weighed nonstatutory aggravators, and erroneously found the aggravating circumstances of CCP and that the murder was committed to avoid arrest. We address each of these claims in turn.

### A. Extreme Mental or Emotional Disturbance Mitigating Circumstance

In this claim, Davis contends that the trial court's decision to reject the extreme mental or emotional disturbance mitigating factor was not supported by competent, substantial evidence and that the trial court's sentencing order as to the rejection of this mitigator was defective. We address each argument individually.

Davis first claims that the trial court's decision to reject the statutory mitigating circumstance at issue was not supported by competent, substantial evidence. He argues that the trial court, in deciding to reject this statutory mitigating circumstance, erroneously concluded that mental illness was not the cause of, or even a major contributing factor to, the murder.

In addressing claims that a trial court erroneously rejected a statutory mitigating circumstance, this Court has stated that "[w]here it is clear that the trial court has considered all evidence presented in support of a mitigating factor, the court's decision as to whether that circumstance is established will be reviewed only for abuse of discretion." Ault v. State, 53 So. 3d 175, 186-87 (Fla. 2010). "The trial court's findings will be upheld where there is competent, substantial evidence in the record to support each finding." Id. at 187.

During both the guilt- and penalty-phase proceedings, multiple psychologists testified as expert witnesses regarding Davis's mental state at the time of the murder. While each psychologist testified that Davis suffered from some form of

mental illness, the psychologists' opinions as to the effect of that mental illness on Davis's mental state at the time of the murder varied widely.

Dr. Golden, who testified for the defense during the guilt-phase proceedings, diagnosed Davis with bipolar disorder and borderline personality disorder and also found Davis exhibited characteristics of antisocial personality disorder. Dr. Golden concluded that Davis did not think his actions were wrong at the time of the murder because he was suffering from command hallucinations, which forced him to commit the murder in order to protect his former girlfriend Jody and her son from harm. Despite these diagnoses, however, Dr. Golden noted that Davis had an IQ score of 127 and was an extremely intelligent individual.

Dr. Tressler, who testified for the State during the guilt-phase proceedings, also diagnosed Davis with bipolar disorder, but differed from Dr. Golden in that he actually diagnosed Davis with antisocial personality disorder. With respect to Davis's reported command hallucinations, Dr. Tressler stated that he found it difficult to conclude that the hallucinations were valid and that such hallucinations were not symptomatic of any mental health problem that Davis was known to have. Additionally, Dr. Tressler stated that objective testing indicated that Davis was exaggerating the symptoms he allegedly experienced as a result of his mental illness. Dr. Tressler explained that based on listening to Davis's initial recorded conversation with Investigator Hemmert, Davis "certainly was not in a state of

emotional distress at that time" and there was no evidence that Davis was suffering from active psychosis.

Dr. Riebsame, who testified for the State during the guilt- and penalty-phase proceedings, diagnosed Davis with bipolar disorder and a personality disorder with borderline and antisocial characteristics. However, Dr. Riebsame testified that Davis's hallucinations were contrived and that it was his opinion, based on objective testing, that Davis was exaggerating his symptoms of mental illness and reporting symptoms of mental illness when reporting such symptoms would be to his benefit. During the penalty-phase proceedings, Dr. Riebsame also testified that, within the bounds of reasonable psychological probability, Davis was not under the influence of extreme mental or emotional disturbance when he committed the murder. Dr. Riebsame stressed that in Davis's initial recorded conversation with Investigator Hemmert on the night of the murder, Davis showed no symptoms of extreme mental disturbance.

Finally, Dr. Danzinger, who testified for the defense during the penalty-phase proceedings, diagnosed Davis with bipolar disorder and a personality disorder with borderline and antisocial characteristics. Notably, Dr. Danzinger also testified that he did not find Davis's reported hallucinations plausible and that, as a result, he did not think Davis met Florida's insanity standard. Ultimately, however, Dr. Danzinger testified that Davis was under the influence of an extreme

mental or emotional disturbance when he committed the murder and was in a very agitated and depressed state as a result of being rejected by Jody. In reaching this conclusion, Dr. Danzinger relied heavily on Davis's history of mental illness and the fact that Davis had not taken any medication during the thirteen months leading up to the murder.

A review of the testifying psychologists' opinions as to Davis's mental state at the time of the murder thus reveals that those opinions varied greatly. At one extreme, defense expert Dr. Golden testified that Davis satisfied Florida's insanity standard at the time of the murder, while at the other extreme, State expert Dr. Riebsame testified that Davis was not under the influence of an extreme mental or emotional disturbance when he committed the murder.

In its written sentencing order, the trial court analyzed the expert testimony elicited during trial, expressly noting that the experts who testified "were all very thorough in their evaluations"; that three of the four expert witnesses "did not accept the Defendant's statements to law enforcement that a hallucination . . . caused him to commit the crimes"; and that one expert, Dr. Danzinger, "felt the Defendant fabricated this hallucination." The trial court also noted Dr. Danzinger's testimony that Davis was under the influence of an extreme mental or emotional disturbance when he committed the murder.

Ultimately, however, the trial court concluded that, based upon the trial testimony, Davis "suffer[ed] from a mental illness," but that his mental illness was only a "contributing factor[] to his choices, and not the cause of his actions or that at the time of the murder his mental illness was so extreme that it was a major factor in an inability to control his behavior." In reaching this conclusion, the trial court stated that Davis's statements "to the detective [on] the night of the murder are the most telling of his calculating mind as well as his callous behaviors."

We conclude that this case is analogous to Merck v. State, 975 So. 2d 1054, 1065 (Fla. 2007), in which this Court upheld a trial court's finding that the defendant was not under the influence of an extreme mental or emotional disturbance when he committed the murder. In Merck, the defense's expert witness and the State's expert witness disagreed as to whether the defendant committed the murder while under the influence of an extreme mental or emotional disturbance, and the trial court rejected the mitigator, giving greater weight to the State expert's testimony. Id. This Court upheld the trial court's rejection of the mitigating circumstance, concluding that "[w]e defer to the trial judge's finding that this mitigating factor was not established because his finding was supported by [the State witness's] testimony." Id.

Just as in Merck, the trial court's rejection of the extreme mental or emotional disturbance mitigator in this case is supported by expert witness

- 24 -

testimony from Dr. Riebsame, which the trial court specifically cited in considering the evidence presented with regard to this mitigator. Dr. Riebsame testified during the penalty phase that Davis was not under the influence of an extreme mental or emotional disturbance when he committed the murder, basing his opinion largely upon Davis's recorded statement to Investigator Hemmert immediately after the victim's body was discovered. The trial court explicitly noted that it relied upon this recorded statement in finding that the statutory mitigator did not apply. Accordingly, we conclude that the trial court's rejection of this statutory mitigator was supported by competent, substantial evidence.

Davis also claims that the trial court's sentencing order with respect to the court's rejection of this statutory mitigating circumstance was defective. Specifically, Davis argues that the trial court's sentencing order does not display the "reasoned judgment" that is required for this Court to sustain a trial court's rejection of statutory mitigation because the court merely "summarized the expert testimony generally, then leapt to the conclusion that mental illness not only was not the cause of the charged offenses, but was not even a major factor contributing to them."

"For this Court to sustain a trial court's final decision in its sentencing order, competent, substantial evidence of record must support the trial court's weighing process [of aggravation against mitigation]." Oyola v. State, 99 So. 3d 431, 446

(Fla. 2012) (citing Campbell v. State, 571 So. 2d 415, 419-20 (Fla. 1990)). "Moreover, the trial court's sentencing order must reflect 'reasoned judgment' by the trial court as it weighed the aggravating and mitigating circumstances." Id. (quoting Lucas v. State, 568 So. 2d 18, 20 (Fla. 1990)).

In support of his claim that the trial court's written sentencing order is defective, Davis relies on Oyola, 99 So. 3d at 447, in which this Court reversed and remanded because the trial court failed, in its sentencing order, to "evaluate, in a well-reasoned fashion, how the evidence presented failed to support the mitigating evidence presented by [the defendant]." Id. This Court stated that the trial court's sentencing order "merely gave a brief summary of its findings with regard to the mitigators, and did not expressly and specifically articulate why the evidence presented failed to support the proposed statutory mitigators." Id.

In contrast to Oyola, the trial court in this case provided a lengthy explanation as to why it rejected the statutory extreme mental or emotional disturbance mitigating circumstance. The trial court, over a span of three pages of its sentencing order, analyzed the testimony that was pertinent to the alleged mitigating circumstance and explicitly stated its reasons for not finding the statutory mitigating circumstance. We conclude that this analysis satisfies the requirements this Court has articulated for a trial court's sentencing order and that Davis's claim is therefore without merit.

## B. Weighing of Nonstatutory Aggravators

Davis next asserts that the trial court impermissibly relied on nonstatutory aggravating factors. In support of this claim, Davis points to the portion of the trial court's sentencing order that addresses nonstatutory mitigation. The statements that Davis contends are impermissible are that Davis "was instructed . . . to continue his medications . . . but he chose not to," and that Davis "clearly let the jury and the Court know that in the future he would not be [amenable] to life in prison" but instead "will find a way to kill himself or harm another."

In support of this claim, Davis relies on Miller v. State, 373 So. 2d 882, 886 (Fla. 1979), in which this Court reversed a death sentence because the trial court considered an additional nonstatutory aggravating circumstance when weighing the appropriateness of the death penalty. In its sentencing order, the trial court in that case stated that "the testimony overwhelmingly establishes that the mental sickness or illness that [the defendant] suffers from is such that he will never recover from it, it will only be repressed by the use of drugs." Id. at 885. This Court held that it was "clear from the trial judge's sentencing order that he considered as an aggravating factor the defendant's allegedly incurable and dangerous mental illness," and that the "use of this nonstatutory aggravating factor as a controlling circumstance tipping the balance in favor of the death penalty was improper." Id.

In contrast to <u>Miller</u>, we conclude that this case is more like <u>Perez v. State</u>, 919 So. 2d 347 (Fla. 2005). In <u>Perez</u>, the trial court assigned little weight to a nonstatutory mitigating circumstance because it found that the defendant's bad upbringing, which formed the basis of the mitigating circumstance, actually "contributed to a combination of antisocial personality features and borderline personality features." <u>Perez</u>, 919 So. 2d at 375. On appeal to this Court, the defendant claimed that <u>Miller</u> prohibited a trial court from utilizing nonstatutory aggravating circumstances as "anti-mitigation." <u>Id.</u> However, the Court concluded that the trial court's decision was proper because the "trial court's statement . . . was clearly made in its assessment of the <u>weight</u> to be accorded a nonstatutory mitigating circumstance," and the trial court did in fact consider the defendant's mental condition in its analysis of statutory mitigation. <u>Id.</u> at 376.

In this case, the trial court's statements that Davis "was instructed . . . to continue his medications . . . but he chose not to," and that Davis "clearly let the jury and the Court know that in the future he would not be [amenable] to life in prison" but instead "will find a way to kill himself or harm another" were clearly made with regard to its assessment of the <u>weight</u> to be accorded a nonstatutory mitigating circumstance. Here, just as in <u>Perez</u>, the trial court discussed aspects of Davis's mental health history in determining what weight to grant nonstatutory mitigating circumstances. Accordingly, we hold that the trial court did not

improperly rely on nonstatutory aggravating circumstances, and we deny relief on this claim.

## C. CCP Aggravating Circumstance

In this claim, Davis alleges that the trial court erred in finding the CCP aggravating circumstance. While Davis admits that the murder was "cold" and was committed without moral or legal justification, he contends that the trial court erred in finding that the murder was "calculated" or was the result of heightened premeditation. "The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence." Guardado v. State, 965 So. 2d 108, 115 (Fla. 2007).

> To establish the CCP aggravator,
>
> the evidence must show: (1) "the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)"; (2) "the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)"; (3) "the defendant exhibited heightened premeditation (premeditated)"; (4) "the defendant had no pretense of moral or legal justification."

Williams v. State, 37 So. 3d 187, 195 (Fla. 2010) (quoting Franklin v. State, 965 So. 2d 79, 98 (Fla. 2007)). " 'CCP involves a much higher degree of premeditation' than is required to prove first-degree murder." Id. at 195 (quoting Deparvine v. State, 995 So. 2d 351, 381-82 (Fla. 2008)). "Premeditation can be

established by examining the circumstances of the killing and the conduct of the accused." Id. (quoting Franklin, 965 So. 2d at 98). "The CCP aggravator can 'be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.' " Franklin, 965 So. 2d at 98 (quoting Swafford v. State, 533 So. 2d 270, 277 (Fla. 1988)). "Further, 'the evidence must prove beyond a reasonable doubt that the defendant planned or prearranged to commit murder before the crime began.' " Williams, 37 So. 3d at 195 (quoting Thompson v. State, 565 So. 2d 1311, 1318 (Fla. 1990)).

After carefully reviewing the record, we conclude that there is competent, substantial evidence to support the trial court's finding of CCP in this case. First, there is competent, substantial evidence that the murder was committed in a "calculated" manner. By Davis's own account, he went to the dealership on the morning of the murder because, based on his prior visits to the dealership, Davis knew that the victim "was there early in the morning" and that "she was usually by herself." On the morning of the murder, Davis parked his car at the Post Time Lounge, a nearby business, instead of parking at the car dealership. He brought a steak knife with him to the dealership, which the trial court found to be particularly insightful as to Davis's prearranged plan, stating that the knife "was a kitchen utensil normally used for eating a meal . . . [and] would not have been one

- 30 -

someone ordinarily could carry unsheathed about their person for any routine purpose or one to be forgotten in a pants or shirt pocket."

Moreover, after abducting the victim at knife point, Davis drove the victim's car back to the Post Time Lounge parking lot where he parked the victim's car next to his own vehicle. Davis then removed the victim from her car and had her lie down in the backseat of his own car. Davis drove the victim back to his home, where he sexually battered and then strangled her in a matter of about twenty-five minutes. This series of events from the time of Davis going to the dealership to the time of the murder, which is based on Davis's own statements to Investigator Hemmert, shows that Davis had a careful plan to commit the murder.

We conclude that there is also competent, substantial evidence to support the heightened premeditation prong of the CCP aggravator. This Court has previously held that the "[h]eightened premeditation necessary for CCP is established where . . . the defendant had ample opportunity to release the victim but instead, after substantial reflection, 'acted out the plan [he] had conceived during the extended period in which [the] events occurred.' " Hudson v. State, 992 So. 2d 96, 116 (Fla. 2008) (quoting Alston v. State, 723 So. 2d 148, 162 (Fla. 1998)). In Hudson, the defendant was at the victim's apartment with the victim for at least forty-five minutes before the murder occurred. Id. This Court held that this amount of time gave the defendant ample opportunity to reflect upon his actions

and noted that this "evidence alone would be sufficient to establish heightened premeditation." Id. Just as in Hudson, the record in this case illustrates that Davis had "ample opportunity to release the victim," id., but instead committed the murder after an extended period of time.

As the trial court explained, Davis had "sufficient time from the abduction, through the long drive to his home, through the sexual battery and after to reflect upon the effect of the victim's death." Based on this series of events, we conclude that the record contains competent, substantial evidence that Davis had formed the necessary heightened premeditation to support the trial court's finding of CCP. Accordingly, we deny relief on this claim.

### D. Avoid Arrest Aggravating Circumstance

In his final challenge to the trial court's findings as to aggravation and mitigation, Davis claims that the avoid arrest aggravating circumstance is not supported by competent, substantial evidence. The avoid arrest aggravator is applicable when "[t]he capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." § 921.141(5)(e), Fla. Stat. (2011). "The avoid arrest aggravator focuses on the motivation for the crimes." Jennings v. State, 718 So. 2d 144, 151 (Fla. 1998).

"To establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the

sole or dominant motive for the murder was the elimination of a witness." Connor v. State, 803 So. 2d 598, 610 (Fla. 2001) (citing Alston, 723 So. 2d at 160). "In such cases, proof of the intent to avoid arrest or detection must be very strong." Hernandez v. State, 4 So. 3d 642, 667 (Fla. 2009) (citing Riley v. State, 366 So. 2d 19, 22 (Fla. 1978)). This Court has explained that "[m]ere speculation on the part of the [S]tate that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator." Id. (quoting Consalvo v. State, 697 So. 2d 805, 819 (Fla. 1996)).

In addressing this claim, we must determine whether there is competent, substantial evidence in the record to support the trial court's finding of this aggravating circumstance. Guardado, 965 So. 2d at 115. In this case, Davis made no incriminating statements indicating that he killed the victim in order to avoid arrest. In fact, when Davis was specifically asked by Investigator Hemmert whether he committed the murder to ensure that the victim could not later identify him, Davis stated that this was not the reason for the murder.

To support its finding of the avoid arrest aggravator, the trial court relied on several pieces of circumstantial evidence, including the fact that Davis was on probation at the time of the murder and that the victim could identify Davis from his prior visits to the auto dealership. The trial court also noted that the victim did not resist at any point during the abduction or sexual battery. Additionally, the

trial court explained that Davis's actions after the murder indicated that he was attempting to avoid arrest, such as his decision to wrap the victim's body in a blanket and cover her head in a plastic bag before putting her in his car, drive around with the body until sundown, and then return to the Post Time Lounge to transfer the body to the victim's car.

Conversely, Davis contends that his actions do not show that the murder was motivated by an attempt to avoid arrest. In particular, Davis emphasizes that he left the knife he used to abduct the victim and an incriminating bed sheet in his room, and that he drove directly in front of the dealership in order to get to the Post Time Lounge, which are factors that weigh against finding the avoid arrest aggravator.

In evaluating the avoid arrest aggravator in the past, this Court has stated that it may be "significant that the victims knew and could identify their killer," but has also noted that "this fact alone is insufficient to prove the avoid arrest aggravator." Farina v. State, 801 So. 2d 44, 54 (Fla. 2001). While it is clear that the victim in this case knew and could identify Davis, these facts standing alone are not enough to uphold a trial court's finding of the avoid arrest aggravator in the absence of additional evidence supporting the trial court's finding, which we conclude is not present here.

This Court's decision in <u>Doyle v. State</u>, 460 So. 2d 353 (Fla. 1984), is instructive. In <u>Doyle</u>, the defendant, who knew the victim prior to the murder, sexually assaulted and then choked the victim to death. <u>Id.</u> at 355. The trial court found the avoid arrest aggravator based upon the fact that the "victim knew her attacker and would report the rape." <u>Id.</u> at 358. Additionally, the trial court relied on the fact that in "a prior case, Doyle had been given a suspended five-year sentence which would be imposed if he were convicted of any crime." <u>Id.</u> Based upon these factors, the trial court "inferred that the murder was committed to prevent the report of the rape." <u>Id.</u> This Court reversed the trial court's finding of the avoid arrest aggravator, stating:

> It is a tragic reality that the murder of a rape victim is all too frequently the culmination of the same hostile-aggressive impulses which triggered the initial attack and not a reasoned act motivated primarily by the desire to avoid detection. Based on the facts in the record before this Court, we hold that the state has not proven this aggravating factor beyond a reasonable doubt.

<u>Id.</u>

The prominent distinguishing feature between this case and <u>Doyle</u> is that, after committing the murder, Davis drove around with the victim's body in his car for several hours. While the trial court interpreted this action as consistent with an intent to wait until nightfall before returning to the Post Time Lounge parking lot to "transfer the body to [the victim's] vehicle in the dark, and make his getaway," this interpretation is premised on assumption.

- 35 -

There was no direct evidence elicited during trial that supports the trial court's interpretation of why Davis drove around for several hours after murdering the victim. The only evidence with respect to this act came from Davis himself, who told Investigator Hemmert that during the time he was driving around with the victim's body he "[r]eally couldn't figure out what to do." In fact, when Investigator Hemmert asked Davis why he committed the murder, Davis responded that he "kind of tried to figure out a way to . . . die by suicide by cop," a response that is clearly inconsistent with a desire to avoid arrest. As this Court stated in Menendez v. State, 368 So. 2d 1278, 1282 (Fla. 1979), when deciding the applicability of the avoid arrest aggravator, this Court "cannot assume [the defendant]'s motive." Thus, without other evidence showing that Davis's actions after the murder were undertaken to avoid arrest, it is improper to assume that Davis was waiting until nightfall in order to return the victim's body to her car under the cover of darkness.

Moreover, evidence presented at trial actually undermines the trial court's conclusion that Davis's actions were undertaken to avoid arrest. For example, when returning to the Post Time Lounge, Davis drove directly in front of Super Sport Auto, the very place where he abducted the victim earlier that day. This conduct is inconsistent with the trial court's conclusion that Davis was acting out a plan to return the victim to her car and avoid arrest.

- 36 -

While the trial court relied on <u>Preston v. State</u>, 607 So. 2d 404 (Fla. 1992), to support its finding of the avoid arrest aggravator, that case is readily distinguishable. In <u>Preston</u>, in which this Court upheld the trial court's finding of the avoid arrest aggravator, the defendant abducted a convenience store clerk after a robbery, drove her to an isolated area, and then murdered her. <u>Preston</u>, 607 So. 2d at 409. A finding of avoid arrest in <u>Preston</u>, however, is completely consistent with this Court's precedent, which establishes that the avoid arrest aggravator applies in cases "where a robbery victim was abducted from the scene of the crime and transported to a different location where he or she was then killed." <u>Id.</u>; <u>see also</u> <u>Cave v. State</u>, 476 So. 2d 180, 188 (Fla. 1985) (upholding avoid arrest aggravator where, after a robbery, the victim was kidnapped from the store, taken thirteen miles to a rural area, and killed).

However, the factual circumstances in <u>Preston</u> are not analogous to this case. While the facts of <u>Preston</u> clearly show that the murder was committed as a separate act after the robbery was completed to avoid arrest for a predicate crime, the facts in this case do not support such a clear inference—nor was there a predicate crime for which Davis was attempting to avoid arrest <u>prior</u> to his abduction of the victim. Accordingly, we conclude that the trial court's reliance on <u>Preston</u> in finding the avoid arrest aggravator was misplaced.

Instead, we conclude that the circumstantial evidence in this case is insufficient to prove that witness elimination was the dominant motivation behind the murder and that the trial court therefore erred in finding this aggravator. Because we strike the avoid arrest aggravating circumstance, we must analyze whether the trial court's finding of the avoid arrest aggravator constituted harmless error. See Hall v. State, 107 So. 3d 262, 278-79 (Fla. 2012); Reynolds v. State, 934 So. 2d 1128, 1158-59 (Fla. 2006). In making this determination, we take into account our decision that the trial court appropriately found the CCP aggravator and appropriately rejected the extreme mental or emotional disturbance statutory mitigator.

We conclude that the trial court's error in finding the avoid arrest aggravator was harmless beyond a reasonable doubt because, even after the exclusion of this aggravator, the trial court assigned great weight to the remaining five aggravators, did not find any statutory mitigation, and gave varying amounts of weight to six nonstatutory mitigating circumstances. Thus, we hold that there is no reasonable possibility that the trial court's error in finding the avoid arrest aggravator affected the ultimate sentence imposed by the trial court.

## IV. HAC Jury Instruction

In his next claim, Davis contends that the trial court's use of the standard jury instruction regarding the HAC aggravating circumstance was error because

- 38 -

the language used in the instruction is subjective and does not have the effect of narrowing the class of persons eligible for the death penalty. This Court has consistently rejected claims that the HAC aggravator and jury instruction are overbroad and vague. For example, in Hall v. State, 614 So. 2d 473, 478 (Fla. 1993), this Court upheld the current standard HAC jury instruction against a claim that it was vague. Subsequently, this Court has consistently rejected similar claims. See Victorino v. State, 23 So. 3d 87, 104 (Fla. 2009) (rejecting defendant's claim that Florida's HAC aggravator is "constitutionally infirm because it is overbroad and vague"); Francis v. State, 808 So. 2d 110, 134 (Fla. 2001) (explaining that in Hall, this Court upheld the HAC aggravator against a vagueness challenge); Walker v. State, 707 So. 2d 300, 316 (Fla. 1997) (upholding constitutionality of HAC standard jury instruction).

Since we have previously rejected challenges to the standard HAC jury instruction given by the trial court in this case, and Davis presents no compelling basis for us to reconsider our established precedent on this issue, we reject this claim.

## V. **Ring Claim**

Davis contends in this claim that his death sentence is unconstitutional based on the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002). However, Ring is not implicated in this case because the trial court found

the prior violent felony aggravator, as well as the aggravators that the murder was committed in the course of a felony and while the defendant was on felony probation. See, e.g., Kocaker v. State, 119 So. 3d 1214, 1233 (Fla.) ("Ring does not apply to cases where the prior violent felony aggravator exists."), cert. denied, 133 S. Ct. 2743 (2013); Hampton v. State, 103 So. 3d 98, 116 (Fla. 2012) (rejecting a Ring claim where the defendant was on felony probation); Baker v. State, 71 So. 3d 802, 824 (Fla. 2011) ("Ring is not implicated when the trial court has found as an aggravating circumstance that the crime was committed in the course of a felony."); Hodges v. State, 55 So. 3d 515, 540 (Fla. 2010) ("This Court has repeatedly held that Ring does not apply to cases where the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment aggravating factor is applicable.").

Accordingly, we conclude that Davis is not entitled to relief on this claim.

## VI.  Proportionality

In his final claim, Davis contends that death is a disproportionate punishment in this case.  Specifically, Davis argues that the existence of substantial mental illness makes the aggravating circumstances qualitatively less significant and the mitigation weightier than in other cases where the death penalty has been imposed.  While we take note of Davis's nonstatutory mental health mitigation,

- 40 -

based upon a complete review of the record, we reject Davis's proportionality argument.

"The death penalty is 'reserved only for those cases where the most aggravating and least mitigating circumstances exist.' " Silvia v. State, 60 So. 3d 959, 973 (Fla. 2011) (quoting Terry v. State, 668 So. 2d 954, 965 (Fla. 1996)). "Therefore, in deciding whether death is a proportionate penalty, the Court makes a 'comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.' " Id. (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003) (citation omitted)). Accordingly, the Court "consider[s] the totality of the circumstances of the case and compare[s] the case to other capital cases." Offord v. State, 959 So. 2d 187, 191 (Fla. 2007).

"This analysis 'is not a comparison between the number of aggravating and mitigating circumstances.' " Silvia, 60 So. 3d at 973 (quoting Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990)). "Rather, this entails 'a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.' " Id. (quoting Urbin v. State, 714 So. 2d 411, 416 (Fla. 1998)). "In reviewing the sentence for proportionality, this Court will accept the jury's recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors." Id.

In this case, the jury recommended death by a vote of seven to five. The trial court found the following six aggravating circumstances, each of which it assigned great weight: (1) committed while on felony probation; (2) prior violent felony; (3) HAC; (4) committed during the course of a sexual battery or kidnapping; (5) committed to avoid arrest; and (6) CCP. Although we strike the trial court's finding of the avoid arrest aggravator, the trial court's findings with respect to the other five aggravating circumstances remain undisturbed.

The trial court found no statutory mitigation, expressly rejecting the statutory mitigating circumstance that Davis committed the murder while under the influence of an extreme mental or emotional disturbance, which we have affirmed. The trial court did, however, find six nonstatutory mitigating circumstances: Davis suffers from long-term chronic mental health problems (some weight); Davis can be properly treated with medication (some weight); Davis is able to currently adapt to imprisonment (little weight); Davis is able to hold employment (some weight); Davis showed remorse for the murder (some weight); and Davis's appropriate courtroom demeanor (substantial weight).

In challenging the proportionality of his death sentence, Davis relies on case law that is readily distinguishable from this case. See Crook v. State, 908 So. 2d 350, 355-56, 358 (Fla. 2005) (holding that the death penalty was disproportionate in light of the trial court's finding of three aggravating circumstances, three

statutory mitigating circumstances that included the extreme mental or emotional disturbance mitigator and the capacity to appreciate the criminality of his conduct mitigator, eighteen nonstatutory mitgators, and unrefuted testimony that the defendant suffered from organic brain damage and was under the influence of drugs); DeAngelo v. State, 616 So. 2d 440, 442-44 (Fla. 1993) (holding that the death penalty was disproportionate in light of the single CCP aggravator and the defendant's mental health mitigation that arose from bilateral brain damage); Clark v. State, 609 So. 2d 513, 515-16 (Fla. 1992) (holding that the death penalty was disproportionate in light of the single pecuniary gain aggravator and strong nonstatutory mitigation).

To the contrary, we conclude that two decisions from this Court are particularly useful in evaluating Davis's claim that his death sentence is disproportionate. First, this Court's decision in Green v. State, 975 So. 2d 1081 (Fla. 2008), is instructive as to the type of mental health mitigation that this Court has held to be compelling in vacating a defendant's death sentence on proportionality grounds. In Green, this Court stated that "because of the substantial mental health mitigation involved when compared to other cases of murder, [the defendant's] case does not constitute one of the most aggravating and least mitigated so as to deserve a sentence of death." Id. at 1089-90.

In Green, the trial court found all three statutory mitigating factors related to mental health: "that Green was under the influence of extreme mental and emotional disturbance; that his capacity to conform to the requirements of the law was substantially impaired; and that he acted under extreme duress or under the substantial domination of another person." Id. at 1083. This Court reviewed this strong mental health mitigation in light of only one aggravating circumstance: a prior violent felony conviction. Id. at 1088. After carefully reviewing strong mental health mitigation, this Court held that a death sentence was a disproportionate penalty. Id. at 1089. Davis's case is not nearly as mitigated and is substantially more aggravated than Green.

This Court's recent decision in McCoy v. State, 132 So. 3d 756 (Fla. 2013), petition for cert. filed, No. 13-10290 (U.S. May 23, 2014), is also instructive. In McCoy, although both mental health experts who examined the defendant agreed that he "was clinically depressed" and that his "depression had psychotic features," the effect of this psychosis was unclear because "this finding was based on McCoy's inconsistent self-reporting, beginning over a year and a half after the crime, of auditory hallucinations." Id. at 763, 774. Nonetheless, both experts agreed that the defendant "qualified for the statutory mental health mitigator that he was under an extreme mental or emotional disturbance at the time of the crime" and that he "met the criteria for civil commitment at the time of the crime." Id. at

- 44 -

764. Based upon the expert testimony elicited during trial, the trial court found the statutory mitigating circumstance that the defendant was under the influence of an extreme mental or emotional disturbance. Id.

This Court's decision upholding the death sentence in McCoy illustrates that a death sentence is proportionate in this case. First, McCoy was substantially less aggravated than this case. While McCoy involved only two aggravating circumstances, both of which are also present here, this case involves three additional aggravators, including HAC, which has been deemed to be among the most serious aggravators in Florida's statutory death penalty sentencing scheme. Silvia, 60 So. 3d at 974; Aguirre-Jarquin v. State, 9 So. 3d 593, 610 (Fla. 2009). Second, the trial court in McCoy found the extreme mental or emotional disturbance statutory mitigator—a mitigator that the trial court in this case expressly rejected. Thus, not only was McCoy less aggravated than this case, but it was more mitigated as well with respect to mental health mitigation.

In addition, a review of other cases presenting substantial mental health mitigation establishes that death is a proportionate punishment in this case. See Brant v. State, 21 So. 3d 1276, 1288 (Fla. 2009) (concluding that a death sentence was proportionate with two aggravators—HAC and murder committed during a sexual battery; three statutory mitigators, including the defendant's impaired ability to appreciate the criminality of his conduct or to conform his conduct to the

requirements of the law; and several nonstatutory mental health mitigators);

Rogers v. State, 783 So. 2d 980, 987, 1002-03 (Fla. 2001) (holding that a death sentence was proportionate, with two aggravators—pecuniary gain and HAC; several nonstatutory mitigators; and impaired ability to appreciate or conform his conduct to the requirements of the law statutory mitigator based on psychosis, brain damage, psychological disease of porphyria, and alcohol abuse).

For all these reasons, we reject Davis's challenge to the proportionality of his death sentence. We conclude that the death sentence in this case is a proportionate penalty.

## CONCLUSION

After a thorough review of all the issues raised by Davis, and our own independent review of the sufficiency of the evidence, we affirm Davis's convictions for first-degree murder, kidnapping, and sexual battery, and we affirm his sentence of death.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur.
CANADY, J., concurs as to the conviction and concurs in result as to the sentence.
POLSTON, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Seminole County,
      John D. Galluzzo, Judge - Case No. 592009CF005140A000X

James S. Purdy, Public Defender, and Christopher Sinclair Quarles, Assistant Public Defender, and Nancy Jean Ryan, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Stacey Elaine Johns Kircher, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee